145 F.3d 850
 158 L.R.R.M. (BNA) 2263, 22 Employee Benefits
Cas. 1591
 UNITED STATES of America, Plaintiff-Appellant,
v.
PALUMBO BROTHERS, INC., formerly doing business as Leininger
Mid-States Paving Co. and as Palumbo Excavating Co., Monarch
Asphalt Co., Peter A. Palumbo, Joseph Palumbo, Sebastian
Palumbo, Kelson Abdishi, Daniel Ferrarini, and Gerald
McGreevy, Defendants-Appellees.
 No. 97-3807.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 20, 1998.
Decided May 7, 1998.
Rehearing and Suggestion for Rehearing En Banc Denied June 12, 1998.*
 
 John F. Podliska, Mark R. Filip (argued), Asst. U.S. Attys., Office of the U.S. Attorney, Criminal Div., Scott R. Lassar, U.S. Atty., Chicago, IL, for Plaintiff-Appellant.
 Dan K. Webb, Scott J. Szala, Julie A. Bauer, Robert W. Tarun, Winston & Strawn, Chicago, IL, G. Robert Blakey (argued), Notre Dame Law School, Notre Dame, IN, for Palumbo Brothers, Inc., Monarch Asphalt Co., Peter Palumbo and Sebastian Palumbo.
 David E. Springer, Tiffanie N. Cason, Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, Saul M. Pilchen, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for Joseph Palumbo.
 Robert A. Novelle, Serpico, Novelle & Navigato, Chicago, IL, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, Donald N. Novelle, Westchester, IL, for Kelson Abdishi.
 G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, George Murtaugh, Jr., Marc W. Martin (argued), Chicago, IL, for Daniel Ferrarini.
 Theodore T. Poulos, James R. Streicker, Cotsirilos, Stephenson, Tighe & Streicker, Chicago, IL, G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, for Gerald McGreevy.
 Before BAUER, COFFEY and ROVNER, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 A federal grand jury returned an indictment against Palumbo Brothers, Inc., Monarch Asphalt Co., Peter Palumbo, Joseph Palumbo, Sebastian Palumbo, Kelson Abdishi, Daniel Ferrarini, and Gerald McGreevy, alleging various criminal activities in conjunction with schemes to defraud employees, unions, and various governmental entities. The indictment charges, inter alia: (1) predicate acts of mail and wire fraud in a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq.; (2) substantive acts of mail fraud, in violation of 18 U.S.C. § 1341; and (3) the submission of false statements, in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.
 
 
 2
 In two separate motions, the defendants sought the dismissal of portions of a forty-four count indictment. In the first motion, the defendants collectively moved to dismiss Racketeering Acts 1 and 2 in Count 1, Counts 8 through 30, and Counts 35 through 42 of the indictment. The defendants argued that: (1) the indictment fails to charge them with criminal violations of RICO, mail fraud, and ERISA, but instead alleges unfair labor practices and breaches of collective bargaining agreements in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq., and the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141-197; and (2) those labor statutes preempt the criminal prosecution of labor-related activities. In the second motion, Ferrarini individually moved to dismiss Count 1 of the indictment in its entirety. Ferrarini argued that: (1) the essential elements of a RICO offense are not sufficiently stated in the indictment; and (2) therefore, the indictment fails to charge him with a criminal violation of RICO. In separate memorandum opinions and orders, the district court granted both motions.
 
 
 3
 The United States now appeals, arguing that the district court erroneously granted the defendants' motions to dismiss. The government asserts that: (1) neither the NLRA nor § 301 of the LMRA preempts a criminal prosecution, even though the defendants' conduct arguably falls within the scope of federal labor law; and (2) the continuity of a defendant's predicate acts is not an essential element of a RICO offense, and the indictment sufficiently charges Ferrarini with a criminal violation of RICO. For the reasons set forth below, we reverse.
 
 STATEMENT OF FACTS
 
 4
 Palumbo Brothers, Inc. ("PBI") and Monarch Asphalt Co. ("Monarch") were two major road construction firms in Chicago, Illinois engaged in various projects and activities relating to the construction, maintenance, and repair of streets and expressways in Chicago and its surrounding suburbs. The Palumbo firms entered into construction and repair contracts with, among others, the Illinois Department of Transportation ("IDOT"), the Illinois State Toll Highway Authority, and local municipalities throughout the Chicago area.
 
 
 5
 Throughout the relevant time period of the defendants' alleged criminal activities, PBI and Monarch were owned and controlled by members of the Palumbo family, including principal owners Peter Palumbo, Joseph Palumbo, and Sebastian Palumbo. In various positions within PBI and Monarch, the individual Palumbo defendants were responsible for overseeing various administrative functions, which included, inter alia: (1) the general administration of the firms' construction and repair contracts; (2) routine supervision of those projects; (3) the payment and collection of funds; (4) the development and implementation of payroll, wage, and contribution policies; and (5) various matters involving labor relations and labor contracts.
 
 
 6
 Kelson Abdishi was employed by IDOT as a Resident Engineer from 1972 through 1991, and his duties included on-site supervision of various Palumbo projects to ensure the roads and highways were constructed and repaired according to contract specifications and in compliance with IDOT regulations. Abdishi also was required to monitor the completion of those projects to ensure that PBI and Monarch were paid only for work performed and materials actually used. Daniel Ferrarini was employed by PBI as a Plant Supervisor at its Dundee, Illinois plant, and he was responsible for supervising the production and shipment of materials to various project sites. Gerald McGreevy, also employed at the Dundee plant, was a Plant Operator responsible for the production of construction materials that were shipped to project sites and the printing of weight tickets that corresponded to those shipments.
 
 
 7
 The United States charges the defendants with various criminal activities that extended over a period of 23 years from 1973 to 1996, and the indictment alleges that the defendants executed fraudulent schemes throughout PBI and Monarch and engaged in various criminal activities in conjunction with their construction and repair projects. During that time, each defendant, in some capacity, controlled and/or participated in the execution and completion of those projects. To perform this work, PBI and Monarch hired unionized employees who were represented by the International Brotherhood of Teamsters, the Construction and General Laborers District Council of Chicago and Vicinity, and the Fox Valley Laborers (collectively, "the Unions"). Both PBI and Monarch entered into collective bargaining agreements with each of the Unions to establish the terms and conditions of employment. The collective bargaining agreements generally provided for: (1) specific hourly wages; (2) "show-up" payments; (3) minimum guaranteed hours; (4) guaranteed lunch breaks; (5) overtime rates for working during lunch, and on Sundays or holidays; (6) employer statistical records; and (7) employer contributions to the Unions' health, welfare, and pension plans and employee benefit funds.
 
 
 8
 On October 3, 1996, a federal grand jury returned an indictment against PBI, Monarch, Peter, Joseph, and Sebastian Palumbo, Abdishi, Ferrarini, and McGreevy, alleging that the defendants were engaged in schemes to defraud their employees, the Unions, and various governmental entities by depriving them of money to which they were entitled under the terms and conditions of the collective bargaining agreements and under the provisions of the government contracts. The United States superseded the original indictment two times, first on November 21, 1996, before the defendants filed their motions to dismiss, and then again on July 23, 1997, after the defendants filed the motions. The allegations in the superseding indictments do not materially differ from those in the original, and the only significant change in the second superseding indictment is that the government increased the number of labor-related allegations from twenty-nine to thirty-two counts. The second superseding indictment is the subject of this appeal. Racketeering Acts 1 and 2 in Count 1, Counts 8 through 30, and Counts 35 through 42 of the indictment are the subject of the defendants' collective motion to dismiss, and Count 1 in its entirety is the subject of Ferrarini's motion to dismiss.
 
 
 9
 In Count 1, the United States charges the defendants with a substantive RICO offense, in violation of 18 U.S.C. § 1962(c). The indictment identifies 23 predicate acts, including: (1) acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; and (2) payment of unlawful funds, in violation of Illinois law. Racketeering Acts 1 and 2 charge only PBI and its principal owners with predicate acts of mail fraud that advanced the defendants' scheme to defraud their employees and the Unions by depriving them of wages and benefit payments to which they were entitled under the collective bargaining agreements. The indictment alleges that the defendants engaged in practices of under-paying their employees and under-reporting the number of hours worked by them. To execute and conceal this fraudulent scheme, the government contends that the defendants used the United States Postal System to mail false payroll summaries, doctored time reports, falsified compliance documents, and reduced wages and benefit payments. The indictment alleges that the fraudulent mailings deprived the employees and the Unions of approximately $10 million, and, therefore, establish Racketeering Acts 1 and 2 in Count 1.
 
 
 10
 Racketeering Acts 3 through 22 charge various defendants with predicate acts of mail and wire fraud in connection with their scheme to defraud the state and local municipalities. The indictment alleges that the defendants fraudulently billed various governmental entities approximately $15 million for construction materials that were not delivered and road work that was not performed and that the defendants used the postal system and wire transmissions to execute this fraudulent scheme. Racketeering Act 23 charges PBI and Abdishi with bribery and official misconduct in connection with Abdishi's supervision of the defendants' road construction projects, in violation of Illinois law.
 
 
 11
 Counts 8 through 30 of the indictment charge various defendants with individual acts of mail fraud, in violation of 18 U.S.C. § 1341. Some of the mail fraud violations are based on the same fraudulent scheme of PBI and its principal owners to deprive their employees and the Unions of wages and benefit payments and reallege substantially similar facts that implicate the same conduct, which includes the mailing of false payroll statements, doctored time reports, falsified compliance documents, and reduced wages and benefit payments. Each mailing is charged separately as an individual violation of the mail fraud statute, as opposed to their collective use in Count 1 as predicate acts to establish the defendants' pattern of racketeering activity. The remaining allegations in Counts 8 through 30 charge the defendants with mail fraud violations which are based on the defendants' scheme to defraud various governmental entities. Each mailing is charged as an individual violation of the mail fraud statute, and these remaining counts reallege substantially similar facts that illustrate the criminal conduct associated with the defendants' scheme to defraud the state and local municipalities.
 
 
 12
 Counts 35 through 42 of the indictment charge only PBI and its principal owners with making false statements in employment records which were maintained pursuant to ERISA reporting requirements, in violation of 18 U.S.C. § 1027. Specifically, the indictment alleges that the defendants recorded false information about the wages employees were paid and the hours they worked in PBI's employment records, which pertained to the Unions' health, welfare, and pension plans and employee benefit funds. The indictment also alleges that the defendants caused false statements to be reported and published in ERISA compliance documents.[1]
 
 
 13
 DEFENDANTS' MOTION TO DISMISS THE LABOR-RELATED COUNTS OF
 
 THE INDICTMENT
 I. BACKGROUND
 
 14
 On January 10, 1997, the defendants collectively filed a motion to dismiss portions of the indictment pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure. Rule 12(b)(2) provides that "[d]efenses and objections based on defects in the indictment" must be raised prior to trial. Fed.R.Crim.Pro. 12(b)(2). Specifically, PBI and its principal owners moved to dismiss Racketeering Acts 1 and 2 in Count 1; all defendants moved to dismiss Counts 8 through 30; and PBI and its principal owners moved to dismiss Counts 35 through 42 of the indictment.
 
 
 15
 In their brief in support of this motion, the defendants asserted, inter alia, that certain conduct described in portions of the indictment fails to charge criminal violations of RICO, mail fraud, and ERISA; instead the indictment, defendants argued, charges unfair labor practices and breaches of the collective bargaining agreements, in violation of the NLRA and LMRA. The defendants maintained that the dismissal of those portions of the indictment that implicate their breaches of the collective bargaining agreements is warranted because a criminal prosecution of unfair labor activities is inconsistent with labor policy. The defendants argued that the sufficiency of the indictment and the identification of the criminal conduct charged therein depend upon an interpretation of various terms and conditions of the collective bargaining agreements. Therefore, the defendants asserted that the federal labor statutes preempt the criminal prosecution, and the dismissal of Racketeering Acts 1 and 2 in Count 1, Counts 8 through 30, and Counts 35 through 42 of the indictment is appropriate.
 
 
 16
 In response, the United States asserted that preemption pursuant to the NLRA or § 301 of the LMRA does not apply to this indictment. In its brief opposing the motion, the government recognized that labor law primarily governs disputes involving protected labor activities, unfair labor practices, and breaches of collective bargaining agreements. However, the government argued that neither unfair labor practices nor breaches of the collective bargaining agreements are charged in the indictment; instead, the government maintained that the indictment charges the defendants with criminal violations of RICO, mail fraud, and ERISA that incidentally occurred in the context of an employment relationship. Therefore, the United States asserted that neither the sufficiency of the indictment nor the prosecution of the defendants' alleged criminal conduct depends upon an interpretation of the terms and conditions of the collective bargaining agreements, and argued that the preemptive force of federal labor law does not apply to the criminal violations charged in the indictment.
 
 
 17
 On August 15, 1997, the district court granted the defendants' motion and dismissed Racketeering Acts 1 and 2 in Count 1, Counts 8 through 30, and Counts 35 through 42 of the indictment. United States v. Palumbo Bros., Inc., No. 96 CR 613, Mem. Op. & Order (N.D.Ill. Aug. 15, 1997) (Bucklo, J.). Over the government's objections, the district court accepted the defendants' argument that § 301 of the LMRA preempts the labor-related portions of the indictment. The district court explained that the criminal allegations in the indictment derived directly from obligations created in the collective bargaining agreements and determined that the defendants' conduct is unlawful only by virtue of their breaches of certain terms and conditions set forth in those labor contracts. In finding that the defendants' alleged criminal conduct also evidences unfair labor practices, the district court then concluded that § 301 of the LMRA preempts the criminal prosecution of the defendants' labor-related activities.
 
 
 18
 The United States filed a motion for reconsideration. The government argued that even if the defendants' alleged criminal activities qualify as breaches of the collective bargaining agreements, a criminal prosecution may never be preempted by federal labor law. The government also asserted that a civil cause of action is fundamentally different from a criminal prosecution, and one may not invalidate the other. The doctrine of labor preemption is inconsistent with well-settled criminal jurisprudence, the government argued, because the Attorney General retains the discretion and authority to investigate, indict, and prosecute any criminal violation of the law.
 
 
 19
 On October 9, 1997, the district court denied the United States' motion for reconsideration and, in a second opinion, clarified some aspects of its prior decision. United States v. Palumbo Bros., Inc., No. 96 CR 613, 1997 WL 643618 (N.D.Ill. Oct. 9, 1997). The district court reemphasized that the defendants' unlawful activities are based solely on the terms and conditions of the collective bargaining agreements, and concluded that the sufficiency of the indictment cannot be determined without interpreting those agreements. The court reasoned that existing law in the Seventh Circuit compels this conclusion and specifically concluded that allegations in an indictment cannot depend upon the interpretation of a collective bargaining agreement to state the essential elements of a crime. The district court reasserted its initial conclusion that § 301 of the LMRA preempts a criminal prosecution of labor-related activities and concluded that its dismissal of Racketeering Acts 1 and 2 in Count 1, Counts 8 through 30, and Counts 35 through 42 of the indictment was appropriate.
 
 
 20
 The United States filed a timely notice of appeal. On appeal, the government asserts that the district court erroneously granted the defendants' motion to dismiss, arguing that federal labor law can never preempt a criminal prosecution. The government asserts that the remedial schemes of the labor statutes do not authorize criminal penalties for either unfair labor practices or breaches of collective bargaining agreements, and furthermore, those labor laws are not designed to enforce any civil or criminal sanctions. The government argues that the labor sanctions ordered to remedy the defendants' unfair labor practices are not adequate substitutions for the criminal penalties available under RICO, the mail fraud statute, and ERISA imposed to punish the defendants' alleged criminal conduct.
 
 
 21
 We find that the United States' appeal is meritorious, and that the district court erroneously granted the defendants' motion to dismiss. With these facts as an introduction, we now turn to the issues presented for review.
 
 II. ANALYSIS
 
 22
 The issues presented in this portion of the United States' appeal are matters of first impression for the Seventh Circuit. At the heart of this dispute is the relationship between labor policy and criminal jurisprudence and the effect that combination of federal law has on the characterization of a criminal prosecution and the sufficiency of an indictment.[2] In this appeal, even though the alleged criminal conduct developed in the context of an employment relationship and intermingled with unfair labor practices, the United States asserts that the defendants' conduct goes beyond the scope of federal labor law and should be characterized as criminal, subject to prosecution. In response, the defendants argue that their activities are not criminal, but rather civil and within the scope of the labor statutes. Specifically, the defendants characterize their activities as breaches of the collective bargaining agreements, subject only to remedial labor sanctions. We examine the indictment and the substance of the allegations therein to ascertain the fundamental purpose underlying this criminal prosecution.
 
 
 23
 A. THE FRAMEWORK OF AN INDICTMENT AND THE CHARACTERIZATION OF THIS DISPUTE
 
 
 24
 To properly proceed with a prosecution, the government must allege conduct violative of a federal statute. United States v. Sloan, 939 F.2d 499, 501 (7th Cir.1991). An indictment must include all of the essential elements of the crimes alleged therein, and each basis for conviction must be "clearly set out in the indictment." United States v. Miller, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); United States v. Susanne Yoon, 128 F.3d 515, 521-22 (7th Cir.1997). In reviewing the sufficiency of an indictment, a court should consider each "challenged count as a whole and should refrain from reading it in a hypertechnical manner." United States v. McNeese, 901 F.2d 585, 602 (7th Cir.1990). The indictment must be "read to include facts which are necessarily implied" and "construed according to common sense." United States v. Blinder, 10 F.3d 1468, 1471 (9th Cir.1993); Yoon, 128 F.3d at 521-22. This is a case of statutory interpretation which involves issues of law, and we review a district court's application of federal statutes and its dismissal of portions of an indictment de novo. United States v. Powell, 929 F.2d 1190, 1193 (7th Cir.1991).
 
 
 25
 As a preliminary matter, we recognize that the district court examined the defendants' conduct principally as unfair labor practices in the context of a traditional labor dispute and only incidental to the criminal offenses charged in the indictment, and ultimately, the court concluded that the defendants' alleged criminal activities constituted unfair labor practices in violation of federal labor law. For purposes of this appeal, we agree with the district court's conclusion that the alleged criminal conduct described in the indictment also illustrates the defendants' breaches of the collective bargaining agreements.[3] Nevertheless, we review the district court's analysis and independently consider the legal question at the heart of this appeal: whether an indictment that charges criminal offenses and simultaneously implicates unfair labor practices in those criminal allegations can survive labor preemption. However, before we examine the relationship between labor policy and criminal jurisprudence, let us first review the general statutory framework of the NLRA and LMRA.
 
 
 26
 B. FEDERAL LABOR LAW & POLICY: THE NATIONAL LABOR RELATIONS ACT AND LABOR MANAGEMENT RELATIONS ACT
 
 
 27
 Congress created a specific legal framework to resolve legitimate labor disputes and to address particular concerns arising in the context of labor relations.[4] See NLRA, 29 U.S.C. §§ 151 et seq. This framework reflects congressional intent to create a national, uniform body of labor law and policy, to protect the stability of the collective bargaining process, and to maintain peaceful industrial relations. New York Tel. Co. v. New York State Dep't of Labor, 440 U.S. 519, 528, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). The NLRA is a comprehensive code that regulates the unique labor-management relationship and recognizes the importance of protecting employees' rights to organize and to bargain collectively with their employers.[5] Nash v. Florida Indus. Comm'n, 389 U.S. 235, 238, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). The NLRA establishes protected labor activities for employees, and sanctions any unfair labor practices that interfere with those activities. 29 U.S.C. §§ 157, 158. If employees choose to organize, and subsequently elect a union representative, the NLRA also defines each party's bargaining rights and responsibilities and establishes the standards of conduct for employer, employee, and union alike. 29 U.S.C. § 159.
 
 
 28
 To resolve legitimate labor disputes, the NLRA created a centralized agency, the National Labor Relations Board ("NLRB"), to interpret and to administer the federal labor statutes and their uniform policies. 29 U.S.C. § 153. Pursuant to the doctrine of primary jurisdiction, only the NLRB has the jurisdiction and authority to review and remedy unfair labor practices, 29 U.S.C. § 160, and as a general rule, the NLRB preempts both federal and state claims based on conduct that is "arguably prohibited" under the NLRA. San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 242-45, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); see also Vaca v. Sipes, 386 U.S. 171, 179-81, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).
 
 1. NLRA: GARMON PREEMPTION
 
 29
 In Garmon, the Supreme Court articulated a general rule in the context of a legitimate labor dispute to determine the parameters of the NLRB's jurisdiction and the NLRA's preemptive effect:
 
 
 30
 When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.
 
 
 31
 Id. at 245, 79 S.Ct. 773 (emphasis added). Based on the Supremacy Clause in the Constitution,[6] the Garmon doctrine primarily focuses on the conflict between federal and state law and "the nature of the activitieswhich the States have sought to regulate...." Id. at 243, 79 S.Ct. 773 (emphasis added). A primary justification for preemption is "the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules" to the NLRB. Vaca, 386 U.S. at 180-81, 87 S.Ct. 903. Generally, Garmon preemption preserves the NLRB's jurisdiction and prevents state and local regulations from interfering with labor policy. Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 659 (7th Cir.1992) (holding that Garmon "is designed to protect the primary jurisdiction of the NLRB ... by providing the NLRB with exclusive jurisdiction to determine whether given conduct falls within the NLRA") (citations omitted). In Garmon, the Supreme Court specifically emphasized that its "concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered." 359 U.S. at 246, 79 S.Ct. 773 (emphasis added).
 
 
 32
 With this articulated focus on preventing state interference with federal labor policy, courts have indicated a hesitation to extend Garmon preemption to cases involving conflicts between the NLRA and other federal statutes. See e.g., United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 948 F.2d 98, 105 (2d Cir.1991) ("where federal laws and policies other than the NLRA are implicated, the Garmon rule is frequently considered inapplicable") (citing cases). The intersection of, or potential conflict between, federal statutes does not implicate the constitutional concerns underlying Garmon preemption. In addition, principles of statutory construction and interpretation, as well as the underlying statutory policies and congressional intentions, also are important considerations when there is a potential conflict among federal statutes because fundamentally each federal statute has equal effect under the law. The Supreme Court provides that "[i]t is a cardinal principle of construction that .... [w]hen there are two acts upon the same subject, the rule is to give effect to both." United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Congressional intent behind one federal statute should not be thwarted by the application of another federal statute if it is possible to give effect to both laws. Id. Although Garmon preemption has been applied in a few circumstances when the NLRA conflicts with another federal statute,[7] other courts have indicated that Garmon preemption is not implicated by a conflict between the NLRA and other federal statutes. See e.g., Smith v. Nat'l Steel & Shipbuilding Co., 125 F.3d 751, 754-57 (9th Cir.1997) (holding that when the conflict is between federal statutes, Garmon preemption is inapplicable); United States v. Boffa, 688 F.2d 919, 931-33 (3d Cir.1982) (finding that Garmon does not preempt a mail fraud prosecution).
 
 
 33
 We are reluctant to apply Garmon preemption in this case for several reasons. First, the indictment involves the intersection of federal statutes and does not implicate the constitutional concerns underlying Garmon. Second, this dispute involves both civil and criminal federal statutes, and the fundamental differences between a civil cause of action and a criminal prosecution also highlight other significant concerns that illustrate why we are hesitant to apply NLRA preemption. Preemption of portions of the indictment would leave the United States without recourse to punish criminal conduct which Congress specifically sought to prevent by the enactment of RICO, the mail fraud statute, and ERISA, and to sanction by the inclusion of criminal penalties and enforcement provisions in those statutes. The NLRA is designed to protect the collective bargaining process and to resolve legitimate labor disputes, and this indictment clearly does not challenge the bargaining process or implicate a labor dispute. Instead, the indictment specifically charges the defendants with criminal violations of RICO, mail fraud, and ERISA, and the prosecution of those criminal violations interferes with neither the NLRB's jurisdiction nor conflicts with labor policy. Criminal penalties are designed to punish public offenses and to prevent further public harm, not to enforce or vindicate private rights.
 
 
 34
 Finally, even if Garmon preemption does apply to the intersection of federal statutes, we are not convinced that this indictment presents an unresolvable conflict between the preemptive force of the NLRA and the criminal statutes charged that requires us to apply one body of law, labor or criminal, to the exclusion of the other. It is not clearly evident to us that the primary jurisdiction of the NLRB is violated by the government's indictment and potential prosecution of the defendants' alleged criminal conduct. We also are not convinced that allowing the United States to proceed with its prosecution will "seriously jeopardize the delicate labor-management balance achieved under the federal labor laws." Appellee's Brief at 41.
 
 
 35
 In sum, we find little reason why Garmon should apply to preclude a criminal prosecution, particularly when each criminal statute explicitly proscribes the conduct alleged in the indictment. In the absence of any express congressional intent that unfair labor practices, which also independently qualify as violations of criminal statutes, are insulated from criminal liability, we find that the jurisdiction of a federal district court to adjudicate a criminal prosecution does not infringe upon or interfere with the primary jurisdiction of the NLRB. With these policies in mind, we decline to apply the doctrine of primary jurisdiction to the present indictment and conclude that the NLRA does not preempt portions of this indictment.
 
 2. LMRA: § 301 PREEMPTION
 
 36
 Just as federal and state courts are not equipped to displace the role of the NLRB in the administration of labor policy and the resolution of legitimate labor disputes, Congress was concerned that the NLRB is not equipped to provide sufficient remedies for breaches of collective bargaining agreements. In recognizing the balance achieved by a uniform body of federal labor law, Congress articulated another facet of labor preemption, which provides:
 
 
 37
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 38
 29 U.S.C. § 185(a). Section 301 of the LMRA creates a federal cause of action and grants district courts jurisdiction to adjudicate legitimate labor disputes involving breaches of collective bargaining agreements, so that the parties to those agreements have access to civil remedies for breach of contract. Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In accordance with § 301, the Supreme Court recognized that when an unfair labor practice constitutes breach of a collective bargaining agreement, the NLRB's authority "is not exclusive." Smith v. Evening News, Ass'n, 371 U.S. 195, 197, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Section 301 governs claims based directly on rights created by a collective bargaining agreement and claims substantially dependent on an analysis of those agreements. Caterpillar, Inc. v. Williams, 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).
 
 
 39
 To adjudicate and resolve disputes involving breaches of collective bargaining agreements, § 301 of the LMRA "authorizes federal courts to fashion a body of federal law" to enforce those agreements. Lincoln Mills, 353 U.S. at 451, 77 S.Ct. 912. This body of federal law, consistent with the NLRB's administration of labor policy, ensures uniform interpretation of such labor contracts and promotes peaceable resolution of legitimate labor disputes. Id. In Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Supreme Court recognized:
 
 
 40
 The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law....
 
 
 41
 471 U.S. at 211, 105 S.Ct. 1904. Accordingly, to maintain that "uniformity and predictability," the preemptive force of § 301 displaces any independent federal or state cause of action when the claim concerns a legitimate labor dispute and involves the breach of a collective bargaining agreement. Id.
 
 
 42
 Despite the breadth of § 301 preemption, not every cause of action that involves labor-related activities depends on an interpretation of a collective bargaining agreement for its resolution. Id. ("not every dispute concerning employment, or tangentially involving a provision of a collective bargaining agreement, is preempted by § 301 or other provisions of the federal labor law"). Just as federal and state courts are not suited to displace the NLRB and to resolve legitimate labor disputes, the Supreme Court recognized that a LMRA lawsuit is not suited to displace the jurisdiction of federal courts and to resolve claims that (1) involve the application of independent federal statutes or state statutes "rooted in local feeling and responsibility" and (2) concern only collateral issues of labor law. Garmon, 359 U.S. at 244, 79 S.Ct. 773. In Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Supreme Court recognized that "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies...." 421 U.S. at 626, 95 S.Ct. 1830. Accordingly, the uniform policies of labor law and the preemptive force of § 301 do not apply if the claim concerns labor issues that only are tangential to the resolution of the central dispute.[8] Vaca, 386 U.S. at 179-80, 87 S.Ct. 903.
 
 
 43
 Therefore, we recognize that § 301 of the LMRA does not automatically eliminate the viability of a criminal prosecution that implicates arguably unfair labor practices; those unlawful activities may only be collaterally related to labor issues, as compared to a direct association with the criminal charges. It is against this background that we determine whether the United States sufficiently states in the indictment criminal conduct proscribed by RICO, the mail fraud statute, and ERISA without interfering with national labor policy and its uniform application and interpretation.
 
 
 44
 C. RECONCILIATION OF FEDERAL LABOR LAW & POLICY WITH CRIMINAL JURISPRUDENCE
 
 
 45
 The preemptive effect of § 301 of the LMRA as applied to a criminal prosecution is not as clearly evident as the district court concluded, and the basic question engendered by this appeal is: to what extent did Congress intend that criminal statutes of general application apply to unfair labor practices, which are generally governed by the federal labor laws? Therefore, we first consider whether labor law and its uniform policies can be reconciled with RICO, the mail fraud statute, and ERISA to give simultaneous effect to each body of law without contradicting the general purposes or congressional intent underlying either labor law or the criminal code.
 
 
 46
 In United States v. Turkette, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court articulated a rule of statutory construction:
 
 
 47
 In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive."
 
 
 48
 452 U.S. at 580, 101 S.Ct. 2524 (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). When the language of a statute is not clear, however, the Supreme Court concluded that courts should examine congressional intent and legislative history underlying the statute to determine whether there is "a clearly expressed legislative intention to the contrary." GTE Sylvania, Inc., 447 U.S. at 108, 100 S.Ct. 2051; United States v. Doherty, 969 F.2d 425, 429 (7th Cir.1992). Absent a clearly expressed intention that Congress intended one federal statute to preempt another, courts must regard each as effective and give them simultaneous effect. Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). As articulated in our discussion of Garmon preemption, courts are hesitant to find that one federal statute preempts another. Borden, 308 U.S. at 198, 60 S.Ct. 182 ("repeals by implication are not favored"); Red Rock v. Henry, 106 U.S. 596, 601-02, 1 S.Ct. 434, 27 L.Ed. 251 (1883) (holding that two statutes must be read so as to coexist harmoniously unless congressional intent is "clear and manifest").
 
 
 49
 In the context of criminal cases, courts also have indicated a reluctance to interfere with the government's authority to initiate an investigation and its discretion to proceed with a prosecution.[9] See United States v. Int'l Union of Operating Engineers, Local 701, 638 F.2d 1161, 1162 (9th Cir.1979) (concluding that courts should interpret statutes "with a presumption against a congressional intention to limit the power of the Attorney General to prosecute offenses under the criminal laws of the United States"). Courts recognize that criminal prosecution is " 'an executive function within the exclusive prerogative of the Attorney General.' " United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1366 (9th Cir.1987) (citations omitted). The purpose of a criminal prosecution is not to provide a forum for the ascertainment of private rights; " '[r]ather it is to vindicate the public interest in the enforcement of the criminal law.' " Standefer v. United States, 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (quoting United States v. Standefer, 610 F.2d 1076, 1093 (3d Cir.1979)). Additionally, courts have recognized that Congress may limit or reassign prosecutorial authority and responsibility. Case v. Bowles, 327 U.S. 92, 96-97, 66 S.Ct. 438, 90 L.Ed. 552 (1946). If there were ever an exception to the general rule of prosecutorial discretion, the Supreme Court concluded: "[t]o graft such an exception upon the criminal law would require a clear and unambiguous expression of the legislative will." United States v. Morgan, 222 U.S. 274, 282, 32 S.Ct. 81, 56 L.Ed. 198 (1911).
 
 
 50
 In consideration of these principles of statutory construction and the government's ability to efficiently administer the criminal code and to prosecute any violation of criminal law, courts have recognized the inappropriateness of too narrow an interpretation of applicable statutes:
 
 
 51
 To disregard the natural implications of the statute and to imprison our reading of it in the shell of mere words is to commit the cardinal sin in statutory construction, blind literalness.
 
 
 52
 In re Persico, 522 F.2d 41, 64 (2nd Cir.1975) (citing Pope v. Atlantic Coast Line R. Co., 345 U.S. 379, 392, 73 S.Ct. 749, 97 L.Ed. 1094 (1953) (Frankfurter, J., concurring)). In Morgan, the Supreme Court held that a federal statute passed in the interest of public health did not hinder the government's discretionary power to initiate a criminal investigation or interfere with its control over the prosecution of conduct that was also regulated by that public health law. 222 U.S. at 281-82, 32 S.Ct. 81. Accordingly, seemingly conflicting statutes can be given simultaneous effect. Morton, 417 U.S. at 551, 94 S.Ct. 2474 ("it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"). Moreover, that a civil and criminal statute relate to the same subject matter or apply to similar conduct is not unprecedented. United States v. Cappetto, 502 F.2d 1351, 1357 (7th Cir.1974) ("acts which may be prohibited by Congress may be made the subject of both criminal and civil proceedings").
 
 
 53
 Given these canons of statutory construction and criminal jurisprudence, we recognize that the existence of a civil cause of action does not eliminate the availability or merit of an independent criminal prosecution that involves similar facts and implicates the same conduct, and we also observe that the availability of civil remedial orders imposed for violations of federal labor law does not eliminate the potential imposition of criminal penalties available for violations of criminal law. Id. at 1356-57. Wholly apart from any term or condition in a collective bargaining agreement, criminal law independently restricts and prohibits certain conduct by imposing penalties for the commission of a crime. The existence of labor grievance procedures to resolve unfair labor practices and the primary jurisdiction of the NLRB to impose remedial sanctions do not relieve an employer of accountability or insulate it from liability for participating in criminal violations of the law, even though resolution of the labor dispute and adjudication of the criminal prosecution may involve the same set of facts.
 
 
 54
 In its analysis, the district court determined that unfair labor practices, which are regulated by federal labor law, cannot serve as the basis for criminal charges, and therefore concluded that preemption pursuant to § 301 of the LMRA is appropriate because the terms and conditions of the collective bargaining agreements created the defendants' obligations at issue in this indictment. This narrow focus on the collective bargaining agreements is misplaced. The mere reference to the terms and conditions of collective bargaining agreements is insufficient to justify § 301 preemption. Loewen Group Int'l, Inc. v. Haberichter, 65 F.3d 1417, 1423 (7th Cir.1995). We disagree with the district court's conclusions and find that the indictment far exceeds the scope of federal labor law and policy even though the allegations may implicate labor-related activities. The district court's fundamental error is its characterization of the defendants' conduct; it defined the indictment in terms of a legitimate labor dispute and, as a result, incorrectly examined the defendants' conduct only in the context of labor law. This mischaracterization caused the district court to treat the indictment like a civil action instead of a criminal prosecution and led it to an erroneous conclusion.
 
 
 55
 We now turn to the specific allegations in the indictment as defined in terms of violations of criminal law and examine the defendants' conduct and the sufficiency of the indictment in the context of those criminal statutes.
 
 
 56
 1. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
 
 
 57
 Count 1 of the indictment charges the defendants with a substantive RICO offense and alleges 23 predicate acts to establish their pattern of racketeering activity. At issue in this portion of the appeal are Racketeering Acts 1 and 2 in Count 1, which specifically charge PBI and its principal owners with predicate acts of mail fraud. Congress passed RICO in an attempt to minimize systematic corruption, to curtail illegal profits generated through racketeering activities, and to prevent organized crime's further infiltration into legitimate business enterprises. Russello v. United States, 464 U.S. 16, 26-29, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (explaining that RICO was an aggressive initiative to supplement old remedies and to develop new methods for fighting crimes); Turkette, 452 U.S. at 580-93, 101 S.Ct. 2524 (discussing generally legislative history, senate and congressional reports, and subcommittee hearings regarding the purpose and scope of RICO).
 
 
 58
 While RICO does not apply only to organized crime, it is by definition confined to patterns of criminal activity--i.e., it is unlawful for any person to use a pattern of racketeering activity to conduct or participate in the criminal affairs of an enterprise. 18 U.S.C. § 1961(1); H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In Turkette, the Supreme Count recognized:
 
 
 59
 [I]t was the declared purpose of Congress "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."
 
 
 60
 452 U.S. at 589, 101 S.Ct. 2524 (quoting ORGANIZED CRIME CONTROL ACT OF 1970, Pub.L. 91-452 (1970) (84 Stat. 923)). Congress recognized a need to address the rapid infiltration of systematic corruption into legitimate businesses, and the statutory scheme includes severe criminal penalties, civil forfeiture provisions, and other civil remedies for both civil and criminal RICO violations. 18 U.S.C. §§ 1963 and 1964. In Turkette, the Supreme Court concluded that RICO's legislative history indicates that Congress was well aware it entered into a new domain of federal involvement and enabled the federal government to address a large and seemingly neglected problem, whereby "existing law, state and federal, was not adequate to address the problem, which was of national dimensions." 452 U.S. at 586, 101 S.Ct. 2524.
 
 
 61
 RICO expressly defines those activities which are prohibited:
 
 
 62
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of an unlawful debt.
 
 
 63
 18 U.S.C. § 1962(c). Thus, a violation of RICO occurs when a person is (1) employed by or associated with (2) an enterprise (3) engaged in or affecting interstate commerce, (4) where that person conducts or participates in a pattern of racketeering activity or the collection of an unlawful debt. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); McDonald v. Schencker, 18 F.3d 491, 494 (7th Cir.1994). The government must allege each of these elements in an indictment to charge a criminal RICO violation. 18 U.S.C. § 1962(c). Separate violations of other federal and state criminal statutes are the predicate acts upon which a pattern of racketeering activity is created. Those predicate acts involve conduct that is otherwise "chargeable" or "indictable" and violations that are "punishable" pursuant to independent criminal statutes, and RICO specifically identifies mail fraud as a predicate act for liability. 18 U.S.C. § 1961(1). A RICO offense involves the relationship of those predicate acts in a pattern of criminal activity. Therefore, to establish a criminal violation of RICO, the government must first establish a defendant's predicate acts. In light of the present indictment, to ultimately resolve any conflict between federal labor law and RICO, we first must consider the relationship between labor law and the mail fraud statute.
 
 
 64
 Congress enacted the mail fraud statute to protect the integrity of the United States Postal System and to prevent it from being used as an "instrument of crime." McNally v. United States, 483 U.S. 350, 365, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (Stevens, J., dissenting). The mail fraud statute imposes criminal penalties for any fraudulent use of the mail to deprive an individual of money or property. 18 U.S.C. § 1341. When the charge is mail fraud, this court uses a broad rather than a technical standard to determine the sufficiency of an indictment. United States v. Brack, 747 F.2d 1142, 1147 (7th Cir.1984). Generally, a mail fraud violation includes two fundamental elements: (1) a scheme to defraud; and (2) the use of the mail in furtherance of that fraudulent scheme. United States v. Biesiadecki, 933 F.2d 539, 545 (7th Cir.1991). This Circuit has recognized that mail fraud applies broadly to schemes that deprive individuals of money by making a false statement, or providing a half truth that is misleading, expecting that individual to act upon it to his detriment. Emery v. Am. Gen. Fin., Inc., 71 F.3d 1343, 1346 (7th Cir.1995). We also have determined that the omission or concealment of material information, even when a statute or regulation does not impose a duty to disclose, constitutes mail fraud. Id.
 
 
 65
 The district court, however, did not begin its analysis with the mail fraud allegations; rather, the court first looked to the statutory language of RICO to determine if Congress intended to preempt a criminal prosecution of unfair labor practices. The district court recognized that the only labor-related activities specifically listed as predicate acts for liability under RICO are: (1) embezzlement from union funds, 29 U.S.C. § 501(c); (2) embezzlement from an ERISA fund, 18 U.S.C. § 664; (3) unlawful payments to welfare funds, 18 U.S.C. § 1954; and (4) unlawful payments to labor unions, 29 U.S.C. § 186. The district court emphasized the significance of congressional silence as to all other labor-related activities and suggested the silence indicated that Congress did not intend to have other labor activities serve as predicate acts in a RICO offense. Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 9. We disagree with the court's rationale. RICO is a statute of general application, and it is impossible for Congress to anticipate, identify, and define each and every context in which a violation of the listed statutes would qualify as a predicate act in a pattern of racketeering activity. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago, 747 F.2d 384, 398 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curium).
 
 
 66
 To resolve the defendants' motion to dismiss, the district court ultimately relied on a line of Supreme Court cases and Seventh Circuit decisions interpreting civil RICO violations in conjunction with unfair labor practices and applied a test articulated by this court in Underwood v. Venango River Corp., 995 F.2d 677 (7th Cir.1993), to determine when Congress intended to preempt a claim pursuant to § 301 of the LMRA. 995 F.2d at 684-85 (overruled on other grounds by Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994)). In Underwood, we explained:
 
 
 67
 The first step asks whether the claim seeks to vindicate a substantive right derived from some source other than the collective bargaining agreement.... If a claim survives the first inquiry, the second step asks whether adjudication of the claim requires interpretation of the CBA. When such interpretation is required, it impermissibly interferes with the federal scheme for labor dispute resolution.
 
 
 68
 Id. at 684. In applying Underwood, the district court determined that: (1) "defendants' alleged mail fraud is unlawful only by virtue of the obligations" in the collective bargaining agreements; and (2) resolution of the dispute requires an interpretation of those bargaining agreements. Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 11-12. Accordingly, the district court concluded that Racketeering Acts 1 and 2 are preempted "to the extent that ... [they are] based on predicate acts of mail fraud in connection with a scheme to defraud defendants' employees and unions." Id. at 13.
 
 
 69
 The district court's interpretation of the indictment, however, is too narrow, and we are not persuaded by its reasoning that neither RICO nor the mail fraud statute are applicable to the defendants' conduct. The defendants' overall scheme alleged in Count 1 of the indictment is to defraud their employees and the Unions and to obtain money by false pretenses through use of the mail. There is nothing in the text of RICO to indicate that mail fraud is not a predicate act in a pattern of racketeering activity when an employer uses the mail to execute a fraudulent scheme. The Seventh Circuit has not specifically considered the sufficiency of an indictment or the merits of a criminal prosecution for mail fraud in the context of an employment relationship. In fact, our research, in addition to the parties' research, identifies only one case that involves a substantially similar issue. In United States v. Boffa, 688 F.2d 919 (3d Cir.1982), the Third Circuit considered the merits of NLRA preemption in relation to a criminal prosecution for mail fraud and concluded that labor law does not preempt a prosecution when the conduct in question also is independently proscribed by another federal statute. However, the district court declined to follow the Third Circuit's analysis, holding that Boffa is not persuasive authority and is distinguishable from the present indictment. Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 12. In fact, the district court suggested that we would have decided Boffa differently in light of this Circuit's prior decisions in Underwood and Talbot. Palumbo Bros., Inc., 1997 WL 643618, at * 3-4.
 
 
 70
 In Boffa, the defendant devised and executed a fraudulent scheme to deprive his employees and a union of wages and benefit contributions, and the indictment charged the defendant with a criminal RICO offense and alleged predicate acts of mail fraud. 688 F.2d at 923. The Third Circuit reasoned that an employee's right to economic benefits, such as wages, is contractual and not statutory in nature, and therefore, the court determined that a fraudulent scheme to deprive individuals of monetary benefits through use of the mail falls directly within the scope of the mail fraud statute, even though those economic benefits were obtained through collective bargaining. Id. at 930. The Third Circuit, therefore, concluded that the NLRA does not preclude "the enforcement of a federal statute that independently proscribes ... conduct," even though that conduct, in the context of a legitimate labor dispute, is governed primarily by federal labor law. Id. at 931. In accordance with its determination that the NLRA does not preclude the enforcement of the mail fraud statute, the Third Circuit reasoned that the NLRA therefore does not preempt a RICO offense predicated on mail fraud. Id. at 933-34.
 
 
 71
 Notwithstanding our prior decisions, we are persuaded by the Third Circuit's analysis in Boffa and recognize that LMRA preemption is analogous to NLRA preemption. If we were to accept the district court's decision to preempt portions of the indictment, the general purpose of RICO would be frustrated, at least in part, when the resolution of a criminal violation involved reference to a collective bargaining agreement. The Supreme Court has recognized:
 
 
 72
 The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose.... Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.
 
 
 73
 United States v. Brown, 333 U.S. 18, 25-26, 68 S.Ct. 376, 92 L.Ed. 442 (1948) (citation omitted). RICO provides that it is unlawful to conduct or to participate in a pattern of racketeering activity, and its statutory provisions are written in general terms to identify conduct that is criminal without regard to the status or ultimate objective of the person(s) engaging in that conduct. 18 U.S.C. § 1962. Penalties imposed pursuant to RICO are supplemental sanctions for otherwise criminal activity.
 
 
 74
 The district court also suggested that the existence of grievance procedures to remedy unlawful labor activity demonstrates congressional intent to remove unfair labor practices from the reach of criminal prosecution. This conclusion also is erroneous. Federal labor laws do not purport to govern all unlawful conduct engaged in by employers, employees, and unions. One court previously recognized:
 
 
 75
 [T]he alleged deprivation of [employee and] union rights are symptoms; the complaint in this case alleges a widespread disease.... The labor statutes are designed to treat these symptoms. RICO was enacted by Congress specifically to cure the disease.
 
 
 76
 U.S. v. Int'l Bhd. of Teamsters, 708 F.Supp. 1388, 1394. In fact, neither the NLRA nor the LMRA provides criminal penalties for unfair labor practices or breaches of collective bargaining agreements. Rather, the Attorney General retains the discretion to investigate, indict, and prosecute, and federal courts have the jurisdiction to adjudicate a prosecution and to impose criminal penalties. In fact, the NLRB lacks the authority to enforce its remedial orders, and parties seeking the enforcement of those orders must seek relief in the courts of appeals.[10] To the extent that labor law governs an employer's breach of a collective bargaining agreement in the context of a legitimate labor dispute, it is clear, however, that labor law does not provide the exclusive remedy for such a breach that advances a fraudulent scheme to deprive employees and unions of economic benefits to which they are entitled.
 
 
 77
 "[W]here Congress has provided remedies for proscribed conduct independent of those available in a NLRB proceeding, the preemption doctrine has no application." Butchers' Union, Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc., 631 F.Supp. 1001, 1007 (E.D.Cal.1986) (citing Vaca, 386 U.S. at 179-80, 87 S.Ct. 903). Nothing in the language or legislative history of labor legislation suggests that penalties imposed for criminal violations should not be available to punish an employer who uses the mail to execute a fraudulent scheme and manipulates the bargaining process to insulate itself from criminal liability. The undisputed availability of criminal sanctions for a RICO violation demonstrates that the grievance procedures and remedial sanctions set forth in the NLRA and LMRA were not intended to be the exclusive means for regulating unfair labor practices that also qualify as criminal offenses, particularly when Congress has explicitly provided criminal penalties for that proscribed conduct. Moreover, there is no basis for the district court's determination that the indictment constitutes an unwarranted extension into the scope of labor-related activities primarily governed by those labor statutes. There is minimal risk, if any, that prosecuting the defendants for alleged criminal conduct would impermissibly interfere with the NLRB's jurisdiction; a criminal prosecution fundamentally does not involve the regulation of labor activities.
 
 
 78
 The defendants cannot challenge the sufficiency of the indictment by defining their conduct as breaches of the collective bargaining agreements and argue that the allegations charged therein are not criminal violations, but rather labor law violations. If an employer were subject to alternative civil causes of action, in addition to the NLRA or LMRA, for unfair labor practices, then an employer would not have any motivation to participate in the collective bargaining process. As a result, Congress' attempt to create an independent statutory framework to govern labor law would be undermined. But, RICO is not designed to protect the private rights of employees or unions; rather, their avenue for relief lies within the scope of labor grievance procedures or a LMRA lawsuit. If an employee or union attempts to disguise a legitimate labor dispute as a RICO claim, we recognize the potential conflict and appreciate why courts have applied either the NLRA or § 301 of the LMRA to preempt that civil RICO claim. If this case involved a civil RICO claim brought by Palumbo employees or the Unions, then possibly the defendants may have had a valid preemption argument. In the context of a legitimate labor dispute where either an employee or union files a civil RICO suit as opposed to following traditional grievance procedures, we recognize that an unresolvable conflict between labor law and civil RICO may emerge and preemption may be required. However, that is not an issue within the scope of this appeal, and we therefore decline to address the merits or success of that hypothetical scenario.
 
 
 79
 Upon closer inspection, the district court relied on cases involving causes of action alleging civil RICO violations while this dispute involves criminal RICO violations. The Supreme Court has indicated that "there are significant differences between civil and criminal RICO actions." Klehr v. A.O. Smith Corp., 521 U.S. 179, ----, 117 S.Ct. 1984, 1990, 138 L.Ed.2d 373 (1997). Nonetheless, the court rejected the government's argument that it should not rely on the authority of cases involving civil RICO, noting that "RICO does not distinguish between plaintiffs." Palumbo Bros., Inc., 1997 WL 643618, at * 5. The district court failed to recognize that there are fundamental differences between a private individual as a plaintiff and the government as a civil litigant in RICO claims that implicate supplemental concerns, notwithstanding the absence of an express articulation of those conflicts. The government seeks to vindicate public harm and to protect the public from systematic and pervasive criminal activities while the individual seeks to enforce private rights in a civil RICO cause of action. Therefore, a test used by courts to determine whether a civil RICO claim is preempted by labor law does not translate into a valid indicator that those labor statutes would also preempt the prosecution of a criminal RICO offense.[11] As a result, we find that Underwood and Talbot are not necessarily determinative in this case.
 
 
 80
 Another significant difference is that civil RICO claims can be filed by either private individuals or the government, while criminal violations are prosecuted only by the United States. To remedy the breach of a collective bargaining agreement in the context of a legitimate labor dispute, civil litigants may file suit pursuant to § 301 of the LMRA for breach of contract, in lieu of other civil actions. This federal cause of action was created to maintain "interpretative uniformity and predictability" of collective bargaining agreements. Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. 1904. Persons or agencies who are not parties to the collective bargaining agreement cannot enforce the terms of that agreement. Souter v. Int'l Union United Auto., Aerospace and Agr. Implement Workers of America, Local 72, 993 F.2d 595, 597 (7th Cir.1993). In other words, the government does not have standing to file suit pursuant to § 301, and the district court's conclusion that the "remedy for these alleged violations must be pursued under federal labor law" lacks effect. Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 12. Without an ability to prosecute, the United States is deprived of its authority to seek punishment for criminal RICO violations; Congress surely did not intend that the government not have the ability to protect the general public from crime and to vindicate public harm for racketeering activities accomplished in the context of an employment relationship. Specifically, there is no clear expression of congressional intent to alter or to limit the broad scope of the government's prosecutorial discretion to seek indictments for violations of RICO in the general context of labor relations. See, e.g., United States v. Sandoval-Curiel, 50 F.3d 1389 (7th Cir.1995).
 
 
 81
 When there is a legitimate labor dispute concerning a collective bargaining agreement, we recognize that preemption is an important tool to effectuate labor policies. If preemption were not available, a fundamental purpose underlying federal labor law and its uniform policies would be invalidated: parties to a collective bargaining agreement could sue directly in federal or state court for breach of contract pursuant to an independent cause of action without first seeking resolution of the labor dispute through the appropriate grievance procedures. However, that tool is not applicable to this indictment. In the present case, it is inconsequential that the United States incidentally implicates breaches of the collective bargaining agreements when it charges the defendants with alleged criminal offenses, because the purpose of the indictment is NOT to remedy a labor dispute, but to prosecute alleged criminal conduct. In addition, a criminal prosecution does not threaten or impair labor policy. Even though unfair labor practices may be implicated by the alleged criminal activities, those unlawful labor activities are merely collateral to the alleged criminal activities which are the subject of the indictment and the focus of the government's prosecution.
 
 
 82
 In sum, we agree with the government's characterization of the function of the collective bargaining agreements: "[i]n the context of this prosecution, the collective bargaining agreement is merely an item of evidence." Appellant's Brief at 17. By this conclusion, we are not overruling Seventh Circuit precedent as articulated in Underwood and Talbot--those cases involved civil violations of RICO and are distinguishable from this criminal prosecution. Rather, we are asserting a fundamental principle of criminal law: an indictment and criminal prosecution for a RICO offense cannot be preempted by federal labor law, notwithstanding a reference to or the interpretation of a collective bargaining agreement. We find that the United States sufficiently alleges in the indictment the defendants' predicate acts of mail fraud to substantiate the allegations in Racketeering Acts 1 and 2. Accordingly, we conclude that the district court erroneously dismissed Racketeering Acts 1 and 2 in Count 1 of the indictment.
 
 2. MAIL FRAUD
 
 83
 Next, we consider the district court's decision to dismiss Counts 8 through 30 of the indictment, which charge the defendants with substantive violations of the mail fraud statute. Some of the conduct described in these counts of the indictment to support portions of the mail fraud allegations specifically reallege facts discussed above in Racketeering Acts 1 and 2 in Count 1, and portions of the conduct described in Racketeering Acts 3 through 22 support the remaining substantive mail fraud charges in association with the defendants' scheme to defraud various governmental entities by fraudulently billing those entities for work not completed and materials not used.
 
 
 84
 Without any discussion, the district court concluded: "Counts 8-30, alleging mail fraud based on the same labor scheme, also are preempted." Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 13. The court reasoned that because Racketeering Acts 1 and 2 in Count 1 are preempted then Counts 8 through 30 automatically are preempted. This conclusion, however, is erroneous, and we disagree with the district court's decision to dismiss Counts 8 through 30. As discussed above, we are persuaded by Boffa and agree with the Third Circuit's analysis. Thus, we conclude that the defendants' scheme to defraud their employees and the Unions of monetary benefits falls directly within the scope of the mail fraud statute, even though those economic benefits were obtained through collective bargaining. 688 F.2d at 930. The analysis of the defendants' acts of mail fraud in Racketeering Acts 1 and 2 in Count 1 as predicate acts in a pattern of racketeering activity translates into a substantially similar analysis of the defendants' acts of mail fraud charged in Counts 8 through 30 as substantive individual violations of the mail fraud statute.
 
 
 85
 In this case, the employees and the Unions' rights to wages and benefit payments also are contractual in nature and not statutory, even though those monetary benefits are defined in the collective bargaining agreements. Congressional intentions underlying the mail fraud statute are to prevent use of the postal system to further such fraudulent schemes, regardless of the origin of the schemes. Accordingly, we find that the broad language of the mail fraud statute proscribes schemes that deprive individuals of their economic benefits, even though their right to those benefits also may be defined in a collective bargaining agreement. We conclude, in accordance with our previous analysis of Count 1, that the substantive violations of the mail fraud statute relating to the defendants' scheme to defraud their employees and the Unions are not preempted by federal labor law.
 
 
 86
 The acts of mail fraud in which the defendants fraudulently billed various governmental entities, however, were not addressed in our previous discussion of Racketeering Acts 1 and 2 of Count 1. The district court concluded that Counts 8 through 30 are preempted because they are "based on the same labor fraud scheme." Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 13. This conclusion, however, is inconsistent with the allegations in the indictment, and we disagree with the district court's conclusion. The remaining substantive violations of mail fraud are based upon the defendants' scheme to defraud various governmental entities by fraudulently billing them for work not performed and materials not used in their construction and repair projects; that scheme is independent of and separate from the defendants' scheme to defraud their employees and the Unions. Although these fraudulent schemes generally include the same participants, encompass similar conduct, and accomplish a common goal, each scheme is independent of the other and requires separate consideration and review. Most important, the defendants' obligations to its employees and the Unions derive from the terms and conditions of the collective bargaining agreements, and those requirements are separate from and substantially different than the defendants' obligations to the state and local municipalities, which derive from provisions of the defendants' government contracts.
 
 
 87
 The district court relied upon the alleged significance of the collective bargaining agreements to dismiss Counts 8 through 30 of the indictment; however, that reasoning does not support the court's conclusion that those allegations charging the substantive violations of the mail fraud statute in connection with the defendants' scheme to defraud various governmental entities, which derive from provisions of their government contracts, also are preempted by labor law. In comparing different fraudulent schemes based on separate contracts, the district court compared apples to oranges and ultimately concluded, without support, that they are substantially the same. Accordingly, we find that the district court erroneously dismissed the substantive violations of mail fraud that derive from the defendants' separate scheme to defraud the governmental entities. In sum, we conclude that the allegations of mail fraud in Counts 8 through 30 of the indictment, which derive from both of the defendants' fraudulent schemes, also survive labor preemption.
 
 3. EMPLOYEE RETIREMENT INCOME SECURITY ACT
 
 88
 Finally, we consider the district court's decision to dismiss Counts 35 through 42 of the indictment, which charge PBI and its principal owners with under-reporting the number of hours worked by the Palumbo employees and submitting false statements in violation of ERISA reporting requirements, 18 U.S.C. § 1027. Specifically, the United States charges that the defendants made false statements in compliance documents and caused false statements to be submitted in reports filed by the Palumbo construction firms.
 
 
 89
 Congress enacted ERISA to govern the development of employee health, welfare, and pension plans and to regulate the maintenance of those plans. 29 U.S.C. § 1001(a) and (c); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); Anweiler v. Am. Elec. Power Serv. Corp., 3 F.3d 986, 989 (7th Cir.1993). ERISA is a comprehensive statute designed to protect the interests of employees and their beneficiaries in those benefit plans, by establishing standards of conduct and obligations for the fiduciaries of those benefit plans and by imposing appropriate sanctions for any violation. 29 U.S.C. § 1001. Jurisdiction of the federal district courts is explicitly established in ERISA, and Congress specifically included employers and unions within the scope of that jurisdiction. 29 U.S.C. § 1001(b). ERISA independently requires that employers who agree to contribute benefit payments to any employee welfare plan or benefit fund absolutely comply with that obligation, and that obligation is separate from any duty to contribute pursuant to the terms and conditions of a collective bargaining agreement. 29 U.S.C. § 1021.
 
 
 90
 To protect the interests of the participants in employee benefit plans, ERISA requires that employers and plan administrators disclose to the participants and their beneficiaries certain financial and other information that describe and summarize the benefit plan. 29 U.S.C. § 1021. The statute specifically defines the information that must be included in those descriptions and summaries. 29 U.S.C. § 1022. Additionally, employers and administrators are required to file annual reports with the Secretary of Labor describing the benefit plans, providing specific information, such as the hours worked by their employees and the wages each employee earned, and identifying any modifications or changes to those plans. 29 U.S.C. §§ 1023 and 1024. ERISA also requires that those reports are published and available to the participants and their beneficiaries of those plans. 29 U.S.C. § 1024. Finally, ERISA requires that any administrator or employer who is subject to the reporting and filing requirements must maintain records that document all of the information and data that is reported and/or filed so that the information can be verified and checked for its truthfulness, accuracy, and completeness. 29 U.S.C. § 1027.
 
 
 91
 Congress also included criminal penalties for violations of these reporting requirements:
 
 
 92
 Whoever, in any document required by ... [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, ... makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify, or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.
 
 
 93
 18 U.S.C. § 1027. To establish a violation of the ERISA reporting requirements, the government must demonstrate that (1) a defendant made a false statement or representation of fact (2) with the knowledge that the false statement or concealment was made in a document required to be published, and (3) the plan in question was an employee welfare benefit or pension plan within the meaning of and subject to the Act. Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 573, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985). As such, employers, plan administrators, and other individuals are subject to criminal penalties for knowingly making false statements or concealing facts in any document or report that is filed or published pursuant to ERISA reporting requirements. Id.; 18 U.S.C. § 1027.
 
 
 94
 The district court employed similar reasoning in its analysis of the alleged ERISA reporting violations as used in its analysis of RICO and the mail fraud statute, and determined that the "truth or falsity of the defendants' statements ... cannot be determined without reference to the underlying [collective bargaining agreements] ... which created the ERISA obligations." Palumbo Bros., Inc., Mem. Op. (Aug. 15, 1997) at 14. In its analysis of the indictment, the district court determined that the defendants' obligations to make contributions, maintain compliance information, and prepare reports derive from the terms and conditions of the collective bargaining agreements and, therefore, "owe their 'existence solely to the terms' " of those agreements. Id. at 14 (quoting Trans World Airlines, Inc. v. Sinicropi, 887 F.Supp. 595, 606 (S.D.N.Y.1995), aff'd, 84 F.3d 116 (2d Cir.1996)).
 
 
 95
 We disagree with this conclusion and again find the district court's analysis and the defendants' arguments unpersuasive. As we discussed above, the district court mischaracterized the fundamental purpose of the government's prosecution and improperly examined the defendants' conduct in the context of a legitimate labor dispute, instead of recognizing the alleged criminality of their conduct, which includes the defendants' violations of ERISA reporting requirements that facilitated their ability to conceal the fraudulent schemes and to maintain their criminal operations. "There can be no doubt that ERISA provides a remedial scheme independent of the NLRA," and to the extent that collateral issues of labor law emerge in the context of an ERISA violation, federal courts have the authority to resolve those issues. Carpenters Local Union No. 1846 of the United Bhd. of Carpenters and Joiners of Am. v. Pratt-Farnsworth, Inc., 690 F.2d 489, 519 (5th Cir.1982). The district court also failed to recognize that the United States does not seek a private remedy for Palumbo employees or the Unions; rather, the government seeks criminal penalties pursuant to 18 U.S.C. § 1027 for the defendants' submission of false statements in ERISA compliance documents. Any unlawful labor activity arising from conduct described in the indictment is merely collateral to the prosecution, and any private remedy available to the employees or the Unions is completely separate and distinct from any criminal penalty imposed for the defendants' alleged criminal conduct.
 
 
 96
 Although the defendants' obligations to contribute are defined in provisions of the labor contracts, the falsity of their statements can be determined, nonetheless, without making the collective bargaining agreements the subject of the dispute. As the Third Circuit suggested in Boffa, certain contractual rights of employees to economic benefits lie squarely within the scope of a criminal prosecution for any fraudulent breach, notwithstanding traditional labor relations. The statute explicitly provides that an employer who knowingly submits false statements in an ERISA document is subject to criminal prosecution, and we conclude that Congress did not intend to insulate employers from prosecution for criminal violations of ERISA based on the mere coincidence that the employer's obligation to contribute to those benefit plans resulted from collective bargaining. Therefore, we conclude that extending labor preemption into the realm of criminal prosecution is unwarranted, and that the district court erroneously granted the dismissal of Counts 35 through 42 of the indictment.
 
 
 97
 On the face of the indictment, it is clear that the government does not seek to remedy unlawful labor activities or to enforce the private rights of the Palumbo employees or the Unions; instead, the indictment charges the defendants with, inter alia, criminal violations of RICO, mail fraud, and ERISA, which are not protected labor activities. The unfair labor practices implicated in the indictment cannot be defined solely in relation to federal labor law and policy; rather, that conduct also must be defined and analyzed in the context of the criminal offenses charged in the indictment. If we were to affirm the district court's decision to dismiss portions of the indictment, we would shield future employers from similar prosecution. Clearly, labor law does not grant an employer the ability to negotiate a collective bargaining agreement, subsequently devise a scheme to defraud its employees and the union, and then because that employer had the foresight to sign a bargaining agreement, ultimately insulate itself from criminal liability.
 
 
 98
 Even though there is an arguable connection between the defendants' alleged criminal conduct and their unfair labor practices, those labor-related issues are collateral to the fundamental purpose and general scope of a criminal prosecution, and the heart of this indictment is the defendants' alleged criminal conduct which is properly charged as violations of RICO, the mail fraud statute, and ERISA. The district court misapplied labor preemption and failed to realize that it can give simultaneous effect to the labor statutes and the criminal code without frustrating labor policy and without limiting the scope of the applicable criminal statutes. Morton, 417 U.S. at 551, 94 S.Ct. 2474 ("the courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"). Accommodation of federal labor policy does not require automatic preemption of a criminal prosecution; it does require that, in the context of a legitimate labor dispute, the remedy for such unfair practices must be sought through the traditional avenues of labor grievance procedures.
 
 
 99
 In the instant case, we find that the United States' decision to indict the defendants for alleged criminal violations of RICO, mail fraud, and ERISA is independent of and distinct from a legitimate labor dispute. The United States' indictment and prosecution of the Palumbo enterprise do not interfere with the primary jurisdiction of the NLRB or impair the underlying purpose and application of federal labor law and policy. Although the terms and conditions of the collective bargaining agreements may be referenced in this prosecution, those labor contracts are not the subject of the dispute, and the adjudication and ultimate resolution of the prosecution will NOT substantially depend upon an analysis of those terms and conditions. Neither the district court's analysis nor the defendants' arguments persuade us that the criminal charges alleged in the indictment significantly offend or hinder labor policies to justify the dismissal of the labor-related portions of the indictment. Accordingly, we conclude that the indictment is valid and that neither the NLRA nor the LMRA has any preemptive effect on this criminal prosecution.
 
 FERRARINI'S MOTION TO DISMISS COUNT 1
 I. BACKGROUND
 
 100
 In Count 1 of the indictment, the United States charges Ferrarini with a substantive RICO offense, in violation of 18 U.S.C. § 1962(c). The indictment identifies a total of 23 predicate acts in a pattern of racketeering activity, but only names Ferrarini in two racketeering acts. Racketeering Acts 21i and 22f specifically charge Ferrarini with predicate acts of mail fraud in connection with the defendants' scheme to defraud various governmental entities. On January 10, 1997, Ferrarini filed a motion to dismiss Count 1 of the indictment in its entirety.
 
 
 101
 In his brief to support the motion, Ferrarini argued that he did not participate in a pattern of racketeering activity or conduct the affairs of a RICO enterprise. He also challenged the sufficiency of the indictment, arguing that the government fails to allege the required elements of a RICO offense. Specifically, Ferrarini asserted that continuity of the predicate acts is a required element of a RICO offense, and the government fails to demonstrate the continuity of his predicate acts in the indictment. In response, the United States argued that the indictment establishes sufficient continuity of Ferrarini's predicate acts to constitute a pattern of racketeering activity because a threat of continuity exists where the predicate acts are part of a routine or the regular way of conducting business.
 
 
 102
 On August 20, 1997, the district court granted Ferrarini's motion to dismiss Count 1 in its entirety. The court rejected his first argument, but accepted the second. First, the district court determined that if the allegations in the indictmentare proven at trial and the defendants are convicted for racketeering activities, then Ferrarini would be deemed to have participated in the affairs of a RICO enterprise. Nonetheless, the district court dismissed Ferrarini from Count 1, holding that the indictment fails to state the required elements of a RICO offense and does not establish the continuity of his predicate acts. The court determined that Ferrarini's predicate acts are only part of a single scheme of fraudulent activity, not a pattern of racketeering activity, and the indictment does not establish sufficient continuity in Ferrarini's conduct. United States v. Palumbo Bros., Inc., No. 96 CR 613, Mem. Op. & Order (N.D.Ill. Aug. 20, 1997) (Bucklo, J.).
 
 
 103
 Thereafter, the United States filed a motion for reconsideration, asserting that it is not necessary to allege continuity with particularity on the face of the indictment. The government argued that demonstrating a pattern of racketeering activity is an essential element of RICO, and that continuity of the defendant's predicate acts is merely a sub-part of the pattern and not an essential element of the crime. The government therefore maintained that the allegations in Count 1, as stated in the indictment, were sufficient to survive Ferrarini's motion to dismiss. In a ruling from the bench on October 10, 1997, the district court refused to reconsider its decision, holding that an indictment has to state a clear basis on which there could be a conviction and concluded that the allegations in Count 1 fail to sufficiently state the elements necessary to charge Ferrarini with a criminal violation of RICO.
 
 
 104
 The United States filed another timely notice of appeal. On appeal, the government challenges the district court's dismissal of Ferrarini from Count 1, asserting that the indictment in fact includes sufficient allegations and states the requisite elements to charge Ferrarini with a substantive RICO violation. The government argues that: (1) it does not have to allege the continuity of Ferrarini's predicate acts in a pattern of racketeering activity with particularity for the indictment to adequately state a violation of RICO; and (2) the allegations in Count 1 of the indictment sufficiently state a clear basis on which Ferrarini could be convicted of a RICO offense.
 
 
 105
 For the reasons discussed below, we find that the United States' appeal is meritorious, and that the district court erroneously granted Ferrarini's motion to dismiss Count 1. With these facts as background, we now turn to the issues presented for review.
 
 II. ANALYSIS
 
 106
 In our review of this motion, we examine the allegations charged in Count 1, specifically Ferrarini's predicate acts, to determine whether the United States alleges the essential elements of RICO to adequately charge Ferrarini with a criminal violation. The fundamental questions before us are: (1) whether the continuity of a defendant's predicate acts is an essential element of a RICO offense that must be explicitly stated in the indictment; and (2) if it is, whether the government's indictment sufficiently alleges the continuity of Ferrarini's predicate acts in a pattern of racketeering activity to charge him with a criminal RICO offense.
 
 
 107
 As discussed in the analysis above, an indictment must include all of the essential elements of a crime to sufficiently charge a criminal violation of the statute proscribing that conduct. Yoon, 128 F.3d at 521-22; Blinder, 10 F.3d at 1471. A violation of RICO occurs when a person is (1) employed by or associated with (2) an enterprise (3) engaged in or affecting interstate commerce, (4) where the person conducts or participates in a pattern of racketeering activity. 18 U.S.C. § 1962(c). To sufficiently allege a pattern of racketeering activity, the statute requires "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). However, something beyond the mere number of acts also is required; the indictment must contain sufficient facts to demonstrate that the racketeering acts are related and that those acts establish or threaten continuing criminal activity. H.J., Inc., 492 U.S. at 239, 109 S.Ct. 2893 (requiring "continuity plus relationship" in a defendant's predicate acts).
 
 
 108
 On appeal, the United States first argues that: (1) continuity is not an essential element of a RICO offense; and (2) an indictment does not have to explicitly delineate the continuity of a defendant's predicate acts to withstand a motion to dismiss. We agree that an indictment does not have to allege continuity with particularity to survive a motion to dismiss. "[C]ontinuity is not an element of a RICO offense, stricto sensu, but it is nevertheless a necessary characteristic of the evidence used to prove the existence of a pattern." United States v. Boylan, 898 F.2d 230, 250 (1st Cir.1990). Continuity of the predicate acts is one element in a pattern of racketeering activity, but it only partially evidences a pattern of conduct. It is the combination of continuity along with the relatedness of the predicate acts that demonstrates the pattern of racketeering activity. Allegations in an indictment do not require conclusive proof of every aspect of the crime to sufficiently allege a violation; rather, an indictment requires only the essential elements. United States v. Webster, 125 F.3d 1024, 1029 (7th Cir.1997). Although continuity is an element of proof necessary at trial to conclusively establish Ferrarini's pattern of racketeering activity, as the First Circuit concluded in Boylan, we agree that it is not an essential element of a RICO offense that must be clearly and specifically established in the indictment.
 
 
 109
 The United States' second argument asserts that the indictment sufficiently demonstrates the continuity of Ferrarini's predicate acts in a pattern of racketeering activity. In reviewing the sufficiency of an indictment, the Supreme Court has explicitly acknowledged that factual allegations may be considered to establish the continuity of a defendant's predicate acts in a pattern of criminal conduct. H.J., Inc., 492 U.S. at 242-43, 109 S.Ct. 2893. Even though explicit allegations of continuity are not required to initially charge a criminal violation of RICO, an indictment must include supplemental facts that reasonably substantiate the existence of continuity, and a district court may consider those external factual allegations in the indictment that identify and describe the elements of the crime to determine the existence of continuity in a defendant's predicate acts. United States v. Turino, 978 F.2d 315, 318 (7th Cir.1992).
 
 
 110
 In reading the indictment as a whole, we find that, even though Ferrarini is named in only two racketeering acts, the indictment includes sufficient facts that reasonably substantiate the existence of a routine and, therefore, the existence of continuity. Mail fraud is more than just a mailing; it requires knowing participation in a fraudulent scheme. United States v. Morris, 80 F.3d 1151, 1160 (7th Cir.1996). The checks that were mailed in each instance resulted from fraudulent conduct whereby Ferrarini repeatedly participated in the creation of false weight tickets over an extended period of time, and those inflated tickets were delivered to the work sites relating to the government projects, as defined by provisions of the defendants' contracts with various governmental entities. We conclude that the indictment reasonably demonstrates sufficient continuity of Ferrarini's predicate acts and that the district court erroneously granted Ferrarini's motion to dismiss Count 1 of the indictment in its entirety.[12]
 
 CONCLUSION
 
 111
 We find that the district court erroneously granted the defendants' collective motion to dismiss Racketeering Acts 1 and 2 in Count 1, Counts 8 through 30, and Counts 35 through 42 of the indictment and Ferrarini's individual motion to dismiss Count 1 in its entirety. Accordingly, we R EVERSE the district court's orders dismissing portions of the indictment and R EMAND for further proceedings consistent with this opinion.
 
 
 
 *
 Neither The Honorable Joel M. Flaum nor The Honorable Kenneth F. Ripple took part in the consideration of the suggestions for rehearing en banc
 
 
 [1]
 The following counts of the indictment are still pending: (1) count 32, which charges PBI, Sebastian Palumbo, Abdishi, Ferrarini, and McGreevy with causing PBI to report and submit false statements in Pay Estimates, in violation of 18 U.S.C. § 1020; (2) counts 31, 33, and 34, which charge PBI and its principal owners with causing PBI to file documents with the Department of Labor that falsely stated employees were paid wages according to the terms of the collective bargaining agreements, in violation of 18 U.S.C. § 1001; and (3) counts 43 and 44, which charge McGreevy with making material false declarations before the grand jury about his knowledge of and participation in the printing of false weight tickets that were used to fraudulently bill customers, in violation of 18 U.S.C. § 1623(a). The indictment also contains a forfeiture claim, which alleges that PBI, Monarch, and its principal owners have property subject to forfeiture pursuant to 18 U.S.C. §§ 1963(a)(1), (2), and (3)
 
 
 [2]
 While the policies underlying federal labor law and the criminal code are independent of one another, certain conduct may fall within the framework of each body of law. For example, the deprivation of property or a contractual right in the context of labor law may constitute an unfair labor practice or a breach of a collective bargaining agreement within the scope of the NLRA or the LMRA, while simultaneously in the context of the criminal code, that conduct may also establish predicate acts in a pattern of racketeering activity in violation of RICO, a fraudulent use of the postal system in violation of the mail fraud statute, or the submission of false statements in violation of ERISA
 
 
 [3]
 It is unnecessary for us to specifically determine that the defendants' activities are, in fact, unfair labor practices in violation of § 7 or § 8 of the NLRA. That analysis is not germane to the resolution of this dispute. If we determined that the defendants' conduct did not violate the employees' or the Unions' protected labor activities, then labor preemption would be a nonissue, and this appeal would be moot. Therefore, we assume for purposes of this appeal that the criminal allegations in the indictment also illustrate that the defendants' conduct qualifies as unfair labor practices
 
 
 [4]
 A legitimate labor dispute involves a conflict between labor and management over the terms and conditions of employment, which generally includes unfair labor practices and/or breaches of collective bargaining agreements. See Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea Co., Inc., 381 U.S. 676, 689-91, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965)
 
 
 [5]
 The National Labor Relations Act has been amended by the Labor Management Relations Act, 29 U.S.C. §§ 141-197 (1982), and the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 401-531 (1982)
 
 
 [6]
 The concept of preemption originates in the Supremacy Clause of the Constitution and focuses on the conflict between federal and state regulation. The Supremacy Clause declares, in relevant part, that federal law "shall be the supreme Law of the Land." U.S. C ONST. Art. VI, cl. 2. Both the Constitution and Congress have reserved exclusive power for the federal government in many enumerated areas, including labor relations. When federal and state laws conflict, the doctrine of preemption is applied, and it resolves the conflict in favor of the federal statute. Rose v. Arkansas State Police, 479 U.S. 1, 3, 107 S.Ct. 334, 93 L.Ed.2d 183 (1986). Also, when a state acts impermissibly in an area reserved exclusively for the federal government, the preemption doctrine invalidates that state action. Id
 
 
 [7]
 In concluding that Garmon preemption does not apply in this case, we do not disturb prior decisions of this court, which have held that Garmon preempts a civil cause of action when the independent federal claim clearly involves a legitimate labor dispute. See Talbot, 961 F.2d at 662 (preempting civil RICO claim under the NLRA); Underwood v. Venango River Corp., 995 F.2d 677, 685 (7th Cir.1993) (preempting civil RICO claim under the Railway Labor Act). Those cases are significantly different from this case, and although the defendants attempt to reconcile them with the present indictment, Underwood and Talbot are not determinative in this prosecution
 
 
 [8]
 Permitting federal courts to retain jurisdiction over independent federal causes of action when labor-related issues are merely collateral to the fundamental dispute is not so extraordinary. Under § 301 of the LMRA, Congress specifically granted district courts jurisdiction to resolve suits involving breaches of collective bargaining agreements. Congress recognized the ability of federal courts to appreciate the relevance and integrity of a uniform labor policy and granted the district courts the authority to apply those policies. Therefore, when a federal court adjudicates an independent federal or state cause of action with collateral labor issues, that court has the ability to recognize and to appreciate the significance of labor policy, and although the court ultimately applies an independent federal or state statute, that federal judge may still consider those labor policies and attempt to reconcile any inherent inconsistency
 
 
 [9]
 The government retains broad discretion in determining whom to prosecute and what charges to file. United States v. Sandoval-Curiel, 50 F.3d 1389, 1394 (7th Cir.1995). In Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985), Justice Marshall recognized:
 Prosecutors simply do not invoke the mail and wire fraud provisions in every case in which a violation of the relevant statute can be proved. For example, only where the scheme is directed at a "class of persons or the general public" and includes a "substantial pattern of conduct," will "serious consideration ... be given to [mail and wire fraud] prosecution[s]." In all other cases, "the parties should be left to settle their differences...."
 The responsible use of prosecutorial discretion is particularly important with respect to criminal RICO prosecutions--which often rely on mail and wire fraud as predicate acts--given the extremely severe penalties authorized by RICO's criminal provisions. Federal prosecutors are therefore instructed that "[u]tilization of the RICO statute, more so than most other criminal sanctions, requires particularly careful and reasoned application."
 473 U.S. at 502-03, 105 S.Ct. 3292 (Marshall, J., dissenting) (quoting U.S. Dept. of Justice, United States Attorney's Manual § 9-43.120 (Feb. 16, 1984); § 9-110.200 (Mar. 9, 1984) (citations omitted)).
 
 
 [10]
 Congress omitted criminal sanctions and civil remedies from the NLRA. 29 U.S.C. § 160. The purpose of the NLRA is remedial and not punitive, and the NLRB only is able to impose cease and desist orders, reinstatement orders, and orders requiring payment of back pay to wrongfully terminated employees for unfair labor practices. 29 U.S.C. § 160(c). In addition, the NLRB cannot directly enforce its orders. Parties must seek relief in the federal courts of appeals to request compliance with the Board's orders. 29 U.S.C. § 160(e)
 
 
 [11]
 In Sedima, S.P.R.L. v. Imrex Co., Inc., Justice Powell recognized:
 We ruled in ... [other Supreme Court cases] that ... [RICO] must be read broadly and construed liberally to effectuate its remedial purposes, but like the legislative history to which the Court alludes, it is clear we were referring there to RICO's criminal provisions. It does not necessarily follow that the same principles apply to RICO's private civil provisions.
 473 U.S. at 529, 473 U.S. 479 (dissenting opinion) (citing cases).
 
 
 [12]
 In reversing the district court's dismissal of Count 1, we are not concluding that Ferrarini actually engaged in a pattern of racketeering activity, nor that he even committed any predicate acts of mail fraud. We are merely holding that, at this stage in the proceedings and with the present record, the United States alleged sufficient facts in the indictment to survive Ferrarini's motion to dismiss